**UNDERHILL ASSOCIATES, INC. et al., Plaintiffs,**

**v.**

**Marshall COLEMAN et al., Defendants.**

**Civ. A. No. 79–388–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Jan. 8, 1981.

James R. Kearney, Miller, Miller & Cyron, Arlington, Va., for plaintiffs.

James E. Moore, Asst. Atty. Gen., Richmond, Va., for Coleman.

Joel H. Peck, Asst. Gen. Counsel, State Corp. Comm., Richmond, Va., D. Eugene Webb, Jr., Richmond, Va., for all other defendants.

## MEMORANDUM

MERHIGE, District Judge.

This action, instituted by three discount securities brokerage firms against the Virginia State Corporation Commission (SCC) and the Director of the Commission's Securities Division, challenges the constitutionality of certain provisions of the Virginia Securities Act, Va.Code 13.1–501, *et seq.* Specifically, plaintiffs contend that the Act's requirement that securities dealers register with the SCC in order to do business in Virginia, and the further requirement that they maintain a regular place of business in Virginia in order to so register, violate the supremacy clause, the commerce clause, the due process clause and the First Amendment.[1] The action was tried, the parties have filed post-trial memoranda, and the matter is ripe for disposition.

Plaintiff Brenner is a Tennessee corporation, registered as a securities broker in that state. Plaintiff Underhill is a New Jersey corporation, registered as a broker dealer pursuant to the laws of New Jersey and New York. Plaintiff First Omaha is a Nebraska corporation, registered as a securities broker dealer in every state except Alaska, Hawaii and Virginia. All three plaintiffs are registered pursuant to Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*; are members of the National Association of Securities Dealers (NASD), a private regulatory organization; and are members of the Securities Investor Protection Corporation (SIPC), a non-profit corporation established by Congress to provide limited protection for customers of liquidated broker-dealer firms, 15 U.S.C. § 78aaa. There being constitutional questions at issue, and more than $10,000 in controversy, the Court's jurisdiction vests pursuant to 28 U.S.C. § 1331(a).

Discount securities brokerage is a relatively new segment of the securities industry, made possible by the abolition of the 1% minimum New York Stock Exchange commission rate on May 1, 1975. Whereas conventional broker dealers provide a wide range of services, including investment advice, underwriting, issuing and distributing securities, and portfolio management, discount brokers such as plaintiffs provide only those services desired by each particular customer, generally only the execution of purchases and sales. The commissions charged by discount brokers are considerably lower than those charged by full service brokers.[2] Plaintiffs advertise their services in local and national publications, and obtain their business through customer-initiated contacts. Customers place orders to

---

1. The original complaint was brought by the National Committee of Discount Securities brokers, an organization comprised of discount brokers such as plaintiffs. In response to doubts as to the Committee's standing to litigate the issues raised by this action, the three discount firms were substituted for the Committee as plaintiffs.

In addition to the four constitutional claims now raised, the complaint originally alleged that the Virginia Blue Sky Law violated the contract clause, the privileges and immunities clause and equal protection. Plaintiffs' post-trial pleadings indicate that these latter claims have been abandoned.

2. Conventional full service brokers generally charge a commission ranging between 1% and 2%. Discount brokers such as plaintiffs charge $3/10$ or $1/2$ of 1%.

buy or sell securities through plaintiffs' Wide Area Telephone Service (WATS) lines. Plaintiffs execute customer orders and confirm the transactions. Upon request, plaintiffs also provide customers with market research information.

The challenged provisions of the Virginia "Blue Sky Law" read as follows:

(a) It shall be unlawful for any person to transact business in this State as a broker-dealer, investment advisor or as an agent, except in transactions exempted by § 13.1–514(b), unless he is so registered under this chapter.

Va.Code 13.1–504(a).

(a) A broker-dealer, investment advisor or agent may be registered after filing with the Commission an application containing such relevant information as the Commission may require. He shall be registered if the Commission finds that he (and, in the case of a corporation or partnership, the officers, directors or partners) is a person of good character and reputation, that he has a regular place of business in this State, that his knowledge of the securities business and his financial responsibility are such that he is a suitable person to engage in the business, that he has supplied all information required by the Commission and that he has paid the necessary fee.

Va.Code 13.1–505(a).

The Commission, may by order entered after a hearing on notice duly served on the defendant not less than thirty days before the date of the hearing, revoke the registration of a broker-dealer, investment advisor or agent (or refuse to renew a registration if an application for renewal has been or is to be filed) if it finds that such an order is in the public interest and that such broker-dealer, investment advisor or any partner, officer or director of such broker-dealer (or any person occupying a similar status or performing similar functions), or any person directly or indirectly controlling or controlled by such broker-dealer or that such agent:

\* \* \* \* \* \*

(6) Has no regular place of business in this state.

Va.Code 13.1–506.

Enforcement of these provisions is the responsibility of the defendants—the members of the SCC, and the Director of the Commission's Securities Division. To apply for registration pursuant to the statute, the applicant must file with the SCC a standard form, which is used by the "Blue Sky" commissions of all 50 states, by the SEC, and by the major stock exchanges. A yearly fee is charged for registration, $25.00 for broker-dealers and $10.00 for agents. No written examination is required for dealers who, like plaintiffs, are members of the NASD or are registered with the SEC.

Plaintiffs have not sought to register as brokers in Virginia, because, they claim, the cost of complying with the registration requirements is prohibitive.

*Due Process.*

Plaintiffs contend that Virginia cannot, consistent with the due process clause, regulate their transactions with Virginia residents. The nature of their business is such, plaintiffs argue, that they do not have sufficient "minimal contacts" with Virginia to be subjected to the state's sovereign decisional authority. Indeed, plaintiffs claim that their contracts with Virginia are "non-existent", in that they do not have offices, agents, or any other physical presence in the state, and do not advertise in Virginia media or solicit business directly from Virginia residents.

■ Due process limitations on the power of a state to exercise its authority over non-residents have evolved primarily in the context of challenges to the state's assumption of personal jurisdiction over non-residents. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). However, the due process clause may also be invoked to challenge the state's power to enforce its substantive law against foreign persons or corporations. *Hartford Accident & Indemnity Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178

(1934); *Travelers Health Association v. Commonwealth of Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). The determination as to the state's power, under the due process clause, to regulate the activities of non-residents is made by reference both to the extent of the non-resident's contact with the state, and to the nature and extent of the state's interest in exercising its authority. *Travelers, supra.*

The instant dispute is similar to a series of cases which upheld state laws regulating the credit rates and contract terms of out of state mail-order businesses against due process challenge. *Aldens Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187; *Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir. 1977); *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir. 1978). Aldens had no agents, offices, or other physical presence in the states which sought to regulate its credit contracts. Nevertheless, the Courts of Appeal found that Aldens' activities within each of the states were sufficient to permit state regulation in light of the states' substantial interest in the credit rates paid by its residents.

 Plaintiffs attempt to distinguish the *Aldens* line in two ways. First, plaintiffs claim that the "minimal contacts" found in the *Aldens* cases are not present here, in that plaintiffs do not send any "physical merchandise" into Virginia, and do not, as did *Aldens*, solicit business through direct mail advertising. In the Court's view, the fact that plaintiffs provide a service rather than "physical goods" is in no way meaningful; nor is the fact that plaintiffs' initial contact with a Virginia resident is initiated by the customer. For due process purposes, it suffices that plaintiffs' activities within the state produce effects within Virginia— effects which the state has an interest in regulating.

Secondly, plaintiffs seek to distinguish the *Aldens* cases by stating that, whereas the conduct sought to be regulated there was the "reprehensible" charging of "usurious" interest rates, plaintiffs activities cannot be characterized with such moral appro-

bation. The Court finds this reasoning unpersuasive. The *Aldens* courts did not characterize Aldens conduct as reprehensible; it was simply not in compliance with state law. Even if there were some meaningful difference in terms of the blameworthiness of the conduct, it is the nature and extent of the state's interest in regulating the conduct that is material. Here, as in the *Aldens* cases, the state interest—the protection of its citizens from incompetent or dishonest securities dealers—is sufficient to pass "the rather low threshold of state interest", *Aldens v. Packel*, 524 F.2d 38, 43, defined by the due process clause.

Thus, the Court concludes in this regard, that plaintiffs' due process challenge to Virginia's power to regulate its activities is without merit. However, the due process inquiry merely goes to whether the state has a sufficient interest, and the regulated non-resident has sufficient contracts, to justify *any* exercise of the state's authority. The question of whether the particular manner and extent of state regulation is permissible must be determined by reference to other constitutional limitations.

*Commerce Clause.*

The standard for judging the constitutionality of state legislation that affects interstate commerce is set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

397 U.S 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174.

Plaintiffs challenge both the in-state office requirement and the requirement that they register with the SCC, as violative of the commerce clause.

 The Court has no difficulty in finding that the registration requirement alone, apart from the administratively imposed condition that the applicant maintain a reg-

ular place of business in Virginia, is in no way inconsistent with the commerce clause. In the first place, the requirement is even-handed: it is no more burdensome for out of state brokers to register than it is for in-state brokers. Secondly, any burden created by the simple registration requirement is no more than incidental; indeed, it is barely discernable. The broker need only file with the commission the standard forms which must be prepared for the SEC and other jurisdictions, along with any other relevant information requested by the SCC and pay a nominal fee. Finally, the Court finds that this minimal burden is clearly not excessive in relation to the benefits it provides. Registration permits the SCC to promote the legitimate local goal of investor protection, by enabling the SCC to make a determination as to the competence and integrity of brokers who wish to transact business with Virginia residents, and by providing the Commission with the information it needs in order to respond to the many inquiries it receives from Virginia residents concerning the backgrounds and qualifications of particular brokers.

■ As the defendants concede, a much more difficult question is presented by the requirement that out of state brokers maintain a full time office within Virginia in order to register to do business with residents. At the outset, the Court notes that the statute does not, by its terms, impose an in-state office requirement. Rather, the statute provides that brokers who meet all of the conditions enumerated in the statute, including that of maintaining an in-state office, "*shall* be registered." Va.Code 13.1–505(a). By implication, the statute therefore leaves discretion with the SCC to approve an application for registration where the in-state office requirement, or any of the other conditions set forth in the statute, has not been met. This interpretation of the SCC's statutory discretion is corroborated by the section of the statute concerning revocation of registration, which permits but does not require the SCC to revoke or to refuse to renew a broker's registration where such revocation "is in the public interest" and where one of the conditions,

including the maintenance of an in-state office, has not been met. Va.Code 13.1–506. However, it is clear that the Virginia office requirement is imposed as a matter of administrative regulation. As admitted by defendants, and as evidenced by two releases from the Director of the Securities Division of the SCC, the SCC treats an in-state office as a prerequisite to registration, and will not approve an application for registration unless the requirement has been met. Therefore, the Court *must* analyze plaintiffs' claims not as a challenge to the statute itself, but rather as a challenge to the administratively imposed in-state office requirement, as that requirement is applied to them.

Plaintiffs claim that the regular place of business requirement is not even-handed and that it imposes a considerable burden on interstate commerce. Therefore, it is contended, and in the Court's view correctly, "the burden falls on the state to justify [the statute] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advisory Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). Plaintiffs maintain that the state has failed to meet this burden, alleging that the in-state office requirement does not effectively promote a legitimate local public interest.

Defendants respond that the requirement is even-handed in that it requires in-state and out of state brokers alike to maintain offices within the state. The Court finds this argument specious. While the requirement is facially neutral, its obvious effect is prejudicial to out of state brokers, who must duplicate the expense of maintaining an office in Virginia in order to do business with its residents. That there is no evidence to indicate that the requirement is intended to have a discriminatory effect is immaterial. *Hunt, supra* at 352, 353, 97 S.Ct. at 2446.

Further, the Court finds that the burden of the requirement on out of state brokers,

and on interstate commerce, cannot be deemed merely incidental. The evidence indicates that the cost of maintaining a full-time office in Virginia is approximately $67,800.00 per year. At least part of this expense would have to be passed on to plaintiffs' customers, thereby reducing plaintiffs' competitive position vis-a-vis both full service brokers and discount brokers headquartered in Virginia. Indeed, in light of the fact that minimizing overhead costs is a key aspect of the discount brokerage business, the Court finds entirely credible plaintiffs' claim that the cost of maintaining an office in Virginia is prohibitive.

The burden on interstate commerce being considerable, and the effect discriminatory, the in-state office requirement can withstand plaintiffs' commerce clause challenge only if it effectively promotes legitimate local interests which cannot adequately be served by less burdensome or discriminatory measures. *Hunt, supra.*

Defendants argue that the in-state office requirement provides investor protection beyond that afforded by the simple registration requirement alone. Specifically, defendants state that the requirement gives Virginia residents "a place to go" to review their accounts, and ready access to the brokers with whom they deal; and further, that it provides the SCC with access to the records of brokers, so that it may investigate customer complaints. In light of the uneven and substantial burden on interstate commerce created by the in-state office requirement, the Court is of the view that these alleged justifications are insufficient. The investor who prefers having face to face contact with his broker and "a place to go" to review his account may, and presumably will, do business with Virginia brokers. While there is no evidence upon which to support or reject the validity of this pronounced justification, the Court has serious doubts that the average investor does in fact wish to, or does visit his or her stock broker's office. There has been no showing that communication by mail and telephone is insufficient to protect the investor who chooses, for whatever reason, to do business with an out of state discount broker such as

plaintiffs. As for defendants' claim that the in-state office requirement is necessary to give the SCC ready access to the records of out of state brokers in the event that customer complaints must be investigated, the Court finds that there are less discriminatory and burdensome means of ensuring that the necessary records are made available. By way of example, the SCC might require out of state brokers, as a condition of registration, to agree to provide the SCC with the records necessary to investigate complaints upon the Commission's request. The Court does not suggest that this would be the best or the only constitutionally permissible way for the SCC to address the concerns expressed by the defendants; rather, the point is simply that the extremely burdensome and uneven in-state office requirement is not the *only* means by which the SCC can adequately protect Virginia's legitimate interest in investor protection.

Thus, the Court finds that the administratively imposed in-state office requirement is unconstitutional as applied to plaintiffs. The SCC may not, consistent with the commerce clause, deny plaintiffs or similarly situated brokers' applications for registration solely on the grounds that the applicant does not have a regular place of business in Virginia.

*Supremacy Clause.*

Plaintiffs contend that the Virginia provisions are preempted by federal regulation under the supremacy clause. It is alleged that Virginia's regulation conflicts with the pro-consumer, pro-competitive policy expressed by Congress and the SEC in abolishing the 1% minimum commission rate, and is "unnecessary" in light of pervasive federal regulation, industry self-regulation, and regulation by the Blue Sky commissions of the states in which plaintiffs are headquartered. Having found that the in-state office requirement violates the commerce clause, the Court need only address plaintiffs' supremacy clause arguments insofar as they challenge the simple registration requirement.

■ As Justice Brennan stated in *Florida Lime and Avocado Growers, Inc. v. Paul,*

... federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.

373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248. Congressional intent concerning the extent to which the Securities Exchange Act preempts state regulation is found in Section 28 of the 1934 Act, 15 U.S.C. § 78bb(a):

Nothing in this chapter shall affect the jurisdiction of the securities commission ... of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

The Supreme Court has held that the purpose and effect of Section 28 is to preserve state regulatory authority to the full extent permissible under the supremacy clause. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 182, 99 S.Ct. 2710, 2716, 61 L.Ed.2d 464 (1979). Thus, Congress, far from having "unmistakably ordained" that the area of securities regulation be entirely occupied by the federal scheme, has clearly chosen concurrent state and federal regulatory authority. *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). State regulation must therefore be upheld unless it conflicts with, or frustrates the purposes of, federal regulation.

Plaintiffs contend that the Virginia provisions are incompatible with the "pro consumer policy expressed by Congress and the SEC in abolishing the 1% minimum New York Stock Exchange commission rate," in furtherance of Section 11A of the Securities Exchange Act, which states that fair competition in securities trading is in the public interest. By "unfairly" burdening discount security brokers, Virginia's regulation, plaintiffs argue, lessens competition among brokers. Without expressing any view as to the merit of this contention as against the in-state office requirement, the Court finds it unpersuasive as a challenge to the simple registration requirement. Even assuming that the purpose of the abolishment of the 1% commission rate was to enhance competition, and that such purpose might place limits on the power of the states to legislate for the purpose of investor protection, there is no evidence that the registration requirement inhibits competition. The registration requirement imposes virtually identical (and minimal) costs on all brokers, whether full service or discount, in-state or foreign; thus, it cannot logically be said to have any effect whatsoever on competition among them.

Finally, the Court is unpersuaded by plaintiffs' contention that the Virginia provisions are vulnerable to supremacy clause attack because they are "unnecessary" in light of pervasive federal regulation, industry self-regulation, and regulation by plaintiffs' "home states". Whatever plaintiffs', or indeed, this Court's opinions, as to the wisdom or necessity of the Virginia registration requirement, concurrent state and federal regulation in the area of securities regulation is clearly permissible, even where there is some overlap or redundancy, so long as the state's regulation does not conflict with or frustrate the purposes of the federal scheme. Additionally, as defendants point out, the Virginia registration statute does provide protections and remedies not afforded by federal regulation.[3]

*First Amendment.*

Finally, plaintiffs contend that the Virginia registration provisions violate the First Amendment rights of both plaintiffs and of Virginia investors. The requirement that plaintiffs register under the Act is alleged to have a "chilling effect" on their exercise of First Amendment rights, in that it prevents them from deriving any economic benefits in Virginia from their commer-

---

3. For example, whereas the SEC reviews only qualifications, the Virginia Securities Division reviews character as well as qualifications; Virginia requires higher net capital than does the SEC and may require a surety bond; and Virginia's regulatory scheme provides for more complete relief, including restitution, penalties and access to the broker's surety bond.

cial speech, in the form of national or local advertisements, unless they register. Plaintiffs' contentions as to the precise manner in which the challenged requirements abridge the expression of Virginia residents is not clear: as far as the Court can discern, the claim is that the Virginia investor's decision to buy or sell a particular security through a discount securities broker is a protected form of expression, which is abridged by the Virginia provisions.

 The Court finds no merit in either of plaintiff's First Amendment claims. While it is clear that "commercial speech" is protected, *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Virginia provisions do not in any way prevent or burden the speech of either plaintiffs or Virginia investors; they simply preclude plaintiffs from transacting business in Virginia unless they have registered with the SCC. The First Amendment does not entitle plaintiffs to maximize the profitability of their commercial speech free of reasonable state regulation. While speech is certainly a crucial aspect of plaintiffs' business, or indeed of any business, "it has never been deemed an abridgment of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language...." *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

The Court finds that the simple requirement that plaintiffs register with the SCC pursuant to Va.Code 13.1–501 in order to do business with Virginia residents does not in any way offend the due process clause, the commerce clause, the supremacy clause, or the First Amendment. As for the administratively imposed requirement that brokers maintain offices in Virginia in order to so register, the Court finds that, as applied to plaintiffs, it is in violation of the commerce clause. An order shall issue enjoining the defendants from denying plaintiffs' applications for registration solely on the grounds that plaintiffs do not maintain regular places of business in Virginia.