**TETRA TECHNOLOGIES, INC., Plaintiff,**

v.

**John C. HARTER, Mayor of the Village of Florida, New York, the Village Board of the Village of Florida, New York and the Village of Florida, New York, Defendants.**

**No. 92 Civ. 7988 (VLB).**

United States District Court, S.D. New York.

June 15, 1993.

---

Michael R. Gottlieb, Middletown, NY, for plaintiff.

Dennis P. Caplicki, Florida, NY, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case involves a contract action brought by plaintiff Tetra Technologies, Inc., a Texas engineering firm (the "Texas company"), against the Village of Florida, New York (the "Village").[1] It presents the ques-

---

1. It has been agreed that the mayor of the Village is not being sued in his personal capacity. Based on that agreement, I deny defendants' motion to dismiss the complaint as to the mayor, who is being sued only in his official capacity. Hereafter, the term "Village" will be used to refer to all defendants.

tion of whether New York professional licensing laws do—or consistently with the Constitution could—require that both contractors and those actually supervising the work be licensed by the State. I answer this question in the negative.

Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.[2] Defendants have moved for summary judgment dismissing the complaint; plaintiff has moved for leave to amend the complaint. I deny defendants' motion and grant plaintiff's motion to amend.

## II

Defendants' principal contention is that the Village need not pay the Texas company for engineering work done for the Village, despite the fact that the engineer actually supervising the work was licensed in New York under New York Education Law § 7202, because the Texas company did not have a New York engineering license.

Education Law § 7202, like most other New York State licensing provisions, is silent with regard to any requirement that employers or contractors have separate licenses in addition to those held by implementing employees. *Charlebois v. J.M. Weller Assoc., Inc.*, 72 N.Y.2d 587, 535 N.Y.S.2d 356, 531 N.E.2d 1288 (1988), albeit over a three-Justice dissent, indicates that where a professional licensed under an applicable state statute is to perform a contract, the signatory of the contract need not also be licensed. I

follow *Charlebois* despite some arguably contrary decisions in lower state courts which need not be discussed here, because *Charlebois* is the latest pronouncement of the state's highest court, and because to do otherwise would violate federal constitutional requirements.[3]

*Charlebois* accords with the objective of protecting the public by assuring that the person in charge of a licensed activity has the necessary knowledge to perform it properly. At the same time, the interpretation it provides avoids the cartel-like effect of raising barriers against entry into a field where there is no consumer benefit from doing so. Such barriers, reminiscent of those imposed by medieval guilds,[4] result in constricted availability of persons eligible to provide the service and in increased cost, both detrimental to rather than protective of the public.[5]

New York's highest court, like the Supreme Court of the United States, utilizes purpose interpretation to assure that legal documents promote their intended purposes and do not boomerang to produce opposite results. See, e.g., *Tedla v. Ellman*, 280 N.Y. 124, 19 N.E.2d 987 (1939); *United States v. Classic*, 313 U.S. 299, 317–18, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1941).

It would be inappropriate to assume that the New York legislature intended to act in a way which would overshoot and thus damage the very purpose for which Education Law § 7202 was enacted—benefitting and protect-

---

**2.** Jurisdiction based on diversity of citizenship is authorized by Article III of the Constitution and by 28 U.S.C. § 1332, which dates to the first Judiciary Act, 1 Stat. 73, 78 (1789), in order to further the objective, also inherent in the Commerce Clause, Art. I § 8, cl. 3, of avoiding risks of local prejudice or restrictions harmful to the Union. This does not affect the content of applicable law, be its source state or federal, which is to be applied evenhandedly by all courts. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**3.** *Charlebois* involved a contract specifying that the work was to be done by a licensed party; such a written provision is an additional safeguard but hardly a *sine qua non*.

**4.** For discussion of medieval guild restraints leading to substitution of the concept of the open

market, see *Hoover v. Ronwin*, 466 U.S. 558, 582–601, 104 S.Ct. 1989, 2002–2012, 80 L.Ed.2d 590 (1984) (dissenting opinion) (holding irrelevant here). For more modern applications, see, e.g., *FMC v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); K. Pribram, *Cartel Problems* (1935).

**5.** See *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337, 1341 (7th Cir.1987); Gellhorn, "The Abuses of Occupational Licensing," 44 U.Chi. L.Rev. 6 (1976); New York State Bar Ass'n, Report of Action Unit # 5, "New York State Regulatory Reform, ch. 2 (1982); Special Committee on Consumer Affairs, "Licensing as a Consumer Protection Measure," 28 Record of The Ass'n of the Bar of the City of New York 646 (1973); Silverman, Bennett & Lechliter, "Control by Licensing Over Entry Into the Market," 8 Law & Contemp.Prob. No. 2 at 209 (Spring 1941).

ing the public. Should ambiguity exist, courts should honor the objectives of statutes as placed before the public, the ultimate supervisory body in a democratic Republic. Posner, "Economics, Politics, and the Reading of Statutes and the Constitution," 49 U.Chi.L.Rev. 263, 273 (1982).

While N.Y. Education Law professional licensing provisions do not contain explicit statements of purpose, unlike some New York State statutes (e.g., State Administrative Procedure Act § 206(1)), the purpose of the licensing requirements is clearly to protect the public safety. There is no suggestion in the New York Education Law that dual licensing of professionals, especially in transactions involving sophisticated institutional customers, would enhance public safety or would protect other legitimate public interests.

### III

As pointed out by the Village, the practice of engineering without a license can constitute a felony. N.Y. Education Law § 6512. But the very existence of criminal sanctions counsels caution in adopting expansive interpretations of the scope of a legal requirement if that interpretation is not clear in advance to those required to comply. See *Dunn v. United States*, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979). Excessive ambiguity and lack of clear notice in a statute concerning activity prohibited by criminal law may raise serious questions of due process under the Fifth and Fourteenth Amendments, to be avoided where possible by construing the governing statute so that its objectives may be achieved without imposing undue risks of unintentional violations. Here, a potentially unconstitutional interpretation can readily be avoided if the statute is construed as requiring that engineering work be done under the watchful supervision of a licensed professional, but as not requiring that the contracting entity also be licensed.

### IV

A sophisticated institutional customer such as a public sector agency having access to legal counsel is hardly in need of protection from unlicensed contractors where the job supervisor is licensed. An in-state institutional customer can be held to know of licensing requirements in its own state, to a greater extent than an out-of-state provider not doing other significant business in the state.

The out-of-state contractor, not the institutional local customer, is the victim of surprise when a question based upon licensing or other state or local requirements is raised subsequent to performance. The New York courts have been at pains to prevent, and not to encourage, surprises sprung upon less knowledgeable contracting parties. See *Charlebois, supra; Bier Pension Plan Trust v. Estate of Schneireson*, 74 N.Y.2d 312, 546 N.Y.S.2d 824, 545 N.E.2d 1212 (1989); *DeSantis v. Sears, Roebuck & Co.*, 148 A.D.2d 36, 543 N.Y.S.2d 228 (1989); *State v. GMC*, 120 Misc.2d 371, 466 N.Y.S.2d 124 (Sup.Ct. 1983); *Ryon v. John Wanamaker*, 116 Misc. 91, 190 N.Y.S. 250 (Sup.Ct.1921), *aff'd* 202 A.D. 848, 194 N.Y.S. 977 (1922), *aff'd* 235 N.Y. 545, 139 N.E. 728 (1923). A rational application of this approach would require a sophisticated New York State institutional customer to avoid unfair surprise to an out-of-state contractor by informing the contractor of any alleged need to obtain a separate license.

In my role as interpreter of the state law applicable in this diversity suit, I have every confidence that the state's highest court would heed the admonition of Benjamin Cardozo in *The Nature of the Judicial Process* 41 (1921):

> No man should profit from his own inequity or take advantage of his own wrong.

To allow a knowledgeable buyer of goods or services to keep silent about an alleged dual licensing requirement, and thereafter, after the work has been done, to premise denial of payment upon failure to meet that requirement, would be to place a judicial stamp of approval upon a successful subversion of the law by permitting exploitation of "an inherent 'potential for abuse,'" *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 947 (2d Cir.1987), *aff'd* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). This would give point to Theodore Roosevelt's rueful statement that "[i]llegal transactions

often occur under the forms of law." Fifth Annual Message, Dec. 5, 1905, 3 *State of the Union Messages of the Presidents* 2148 (1966).

## V

The above observations may also be relevant to a last-minute hearsay assertion, made for the first time in the reply affidavit of the mayor of the Village, that the Texas company's licensed engineer possessed a license only for the later portions of the job and not at the time it was commenced. The problematic nature of hearsay statements made for the first time in the reply affidavit on behalf of the party moving for summary judgment is pointed up in this case, particularly when one considers the numerous concatenations of fact patterns which might exist on an all-facts-known basis. For example, the mayor in his reply affidavit does not indicate whether or not the engineer had an earlier identical or related New York license (or for that matter an equivalent license elsewhere) in addition to the one which, according to the hearsay assertion, was untimely. Nor is it indicated in the reply affidavit what actual physical work, if any, was performed prior to the date the untimely license was obtained.

There is, likewise, no explanation for the delay in providing the limited information set forth in the reply affidavit. The presentation of this question at the eleventh hour, in paragraph 8 of an affidavit devoted primarily to other matters, in itself raises questions about the substantiality of the contention. This is so apart from the question of responsibility for the claimed problem, should it exist: it might be pertinent to know whether the matter was ever raised or examined by the Village when the contract was made or the work done, and if not, why not. An institutional customer, with far greater access to relevant knowledge than a contractor dealing with a complex set of legal require-

ments for the first time, may not sit back and ignore such a matter and then raise it only when it is opportune to refuse payment.

Nor may entirely new but foreseeable points relevant to a motion be presented in a reply affidavit. Here the parties moving for summary judgment saved the claim of incomplete license coverage as their best shot, with the obvious purpose of sandbagging their adversary with a brand new factual contention. Such a procedure is foreign to the spirit and objectives of the Federal Rules of Civil Procedure. See generally, e.g., Fed. R.Civ.P. 1, 12, 26, 56. Were tactics of this type to be permitted, a sur-reply affidavit would be necessary from the adversary, followed by a further supplemental response by the moving party, and so on *ad infinitum.*

■ Moreover, where the mayor in his affidavit purported to treat factual issues in the case, his statements were entirely of a hearsay nature, with no supporting exhibits attached, e.g.:

> We have verified with the New York State Education Department and confirmed [the Village's contentions].

Material in a form not admissible in evidence may be used to *avoid,* but not to *obtain* summary judgment, except where an opponent bearing a burden of proof has failed to satisfy it when challenged after completion of relevant discovery. The Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) dealt with the burdens of the non-moving parties on a motion under Fed.R.Civ.P. 56:

> We do not mean that the *nonmoving* party must produce evidence in a form that would be admissible at trial in order to *avoid* summary judgment.

(emphasis added); see also *Offshore Aviation v. Transcon Lines,* 831 F.2d 1013, 1015 & n. 1 (11th Cir.1987).[6]

---

**6.** The mayor's reply affidavit on behalf of the Village raises sufficient questions that I would not, in any case, rely upon it to support a grant of summary judgment in favor of the Village. I note the large number of conclusory pejorative statements concerning the adversary presented under oath:

> 3. ... [The personnel of the adversary] tried to create factual disputes by referring to

either facts not in issue for the purposes of this motion *or by obfuscating undisputed facts.*

> 4. ... *It is inconceivable how* [the personnel of the adversary] *can claim that they were not fully aware* [of the Mayor's interpretation of certain letters].

> 5. Subsequently *knowing full well* [that the Mayor's interpretations were correct, the adversaries took certain action].

In a less egregious but nonetheless improper manner, the mayor's reply affidavit contains statements of law to which the affiant obviously cannot swear. The memorandum of law by counsel for the defendants was the appropriate vehicle for articulating defendants' legal arguments.

## VI

■ If New York law required, as the Village contends, the Texas contractor to obtain a separate New York engineering license despite the supervision of the work by a locally licensed engineer, this would have an obvious adverse—and differentially adverse—effect on out-of-state contractors. They would not be able to enter the market on short notice, and they would not be able to utilize locally licensed professionals to perform the work. Such a requirement would run squarely counter to the Commerce Clause of the Federal Constitution, Art. I, § 8, clause 3.[7]

A contractor would be effectively barred from conducting nationwide business if required to obtain licenses in every state in which it wished to arrange for engineering work to be supervised by local licensed professionals.[8] Licenses in each locale would, further, have to be secured in advance rather than merely once the business opportunity arose, to avoid undue uncertainty and delay which would render the out-of-state contractor noncompetitive. Variegated requirements of different jurisdictions would have to be discovered and met to the satisfaction of authorities in each jurisdiction. See *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); Pashigan, "Occupational Licensing and the Interstate Mobili-

ty of Professionals," 22 J.Law & Econom. 1 (1979); Morgan, "Accreditation and Diversity in Engineering Education,"·249 Science 969 (August 31, 1990).

The total effect would thus be to cut off most interstate competition for engineering jobs, benefitting local competitors but not the public. The impact of requiring dual licensing (of both contractors and personnel actually conducting activities requiring licenses) as a tourniquet on interstate activity is not only conceded, but frankly avowed in this case. The reply memorandum of law in support of defendants' motion for summary judgment states:

> [I]f a scheme employing only one licensed individual could be used ... numerous foreign corporations would make their way to New York to perform professional engineering services.

The Commerce Clause was intended by the framers of the Constitution to protect commercial intercourse among the several states and has been construed to do so since the days of Chief Justice Marshall. Constriction of interstate trade, such as would be imposed by requiring separate, dual state professional licenses to be obtained by both contractors and actual work supervisors, would be contrary to that objective.

Protection of interstate commerce from local barriers was one of the original objectives of the Constitution. As stated in *The Federalist* No. 22 (Hamilton):

> The interfering and unneighborly regulations of some States, contrary to the true spirit of the Union have, in different instances, given just cause for umbrage and complaint to others, and it is to be feared that examples of this nature, if not re-

---

6. ... [The opponent's] *feigned ignorance* does not create an issue of fact.
7. *In another instance of attempting to obfuscate* [the adversaries made an argument with which the Mayor disagreed]. *This statement is preposterous.*
8. *In still another attempt to cloud the issues ...*
(emphasis added).

7. For purposes of the analysis which follows, I ignore the contention made for the first time in the reply affidavit on behalf of the Village that the Texas company's licensed local engineer was licensed only for part of the period during which

work was done, a contention discussed in part V above.

8. I have found N.Y.Education Law § 7202 to have been satisfied by supervision of the work by a licensed professional. Hence there is no conflict between New York Education Law § 7202 and the Commerce Clause, either on the face of § 7202, *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 144, 90 S.Ct. 844, 848, 25 L.Ed.2d 174 (1970), or as § 7202 has been applied, see *New York Civil Service Commission v. Snead,* 425 U.S. 457, 96 S.Ct. 1630, 48 L.Ed.2d 88 (1976).

strained by a national control, would be multiplied and extended ...

The roots of concern in regard to local cartel-like restrictions are deep and begin with the Great Charter of King John of 1215 (Magna Carta), chapter 41:

> All merchants shall have safe and secure ... entry into England with the right ... to move about ... by land as by water, for buying and selling by the ancient and right customs.

Although Chapter 41 dealt with importation, it also clearly dealt with the right to move about for buying and selling within the realm, treating this as an ancient and appropriate custom which should not be subject to local interference.

During colonial days, laws favoring local interests were likewise resisted by the judiciary. See Smith, "Administrative Control of the Courts of the American Plantations," 61 Colum.L.Rev. 1210, 1234 (1961): "A recurring theme in procedural disallowances was the protection of nonresidents against discriminatory enactments."

Justice Holmes reflected the traditional recognition of the importance of this problem in *Collected Legal Papers* at 296 (1921):

> I ... think the Union would be imperiled if we could not make that declaration [as to constitutional invalidity] as to the laws of the several States. For one in my place sees how often a local policy prevails with those who are not trained to national views and how often action is taken that embodies what the Commerce Clause was meant to end.

Concern relating to the danger of local obstructions to interstate commerce became especially pointed during the period when the United States became the arsenal of democracy from 1939 to 1945, because of the risk that such barriers could impede the nation's productivity. See Symposium, "Interstate Trade Barriers in the United States," 8 Law & Contemp.Prob. No. 2 at 207 (Spring 1941); Donoho, "Interstate Trade Barriers—A Joint Federal–State Problem," 17 Tenn.L.Rev. 21 (1941).[9]

In this context, restrictive licensing schemes, such as mandatory dual licensing requirements with little or no justification, or licensing requirements in connection with work for sophisticated institutional customers, have long been recognized as significant barriers.[10]

The Constitution was intended not only to avoid interstate conflict and provide the benefit of nationwide availability of goods and services produced in each state, but also to furnish protection against overbearing local special interests, defined as factions at the time of the Constitution. As stated by James Madison in *The Federalist* No. 10:

> Among the numerous advantages promised by a well-constructed Union, none deserves to be more accurately developed than its tendency to break and control the violence of faction.

This principle was articulated in twentieth century terms by Chief Justice Stone in *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 767–68 n. 2, 65 S.Ct. 1515, 1520 n. 2, 89 L.Ed. 1915 (1945):

> [T]he Court has often recognized that to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.[11]

---

**9.** See generally Civilian Production Board, *Industrial Mobilization for War*, General Study # 1, Historical Reports on War Administration, War Production Board (1947); R. Connery, *The Navy and the Industrial Mobilization in World War II* (1951).

**10.** The literature on this subject is extensive; see, e.g., Gellhorn, "The Abuses of Occupational Licensing," 44 U.Chi.L.Rev. 6 (1976); New York State Bar Ass'n, Action Unit # 5, "New York State Regulatory Reform" ch. 2 (1982); Silverman, Bennett & Lechliter, "Control by Licensing

Over Entry Into the Market," 8 Law & Contemp.Prob. No. 2, at 209 (Spring 1941).

**11.** This concept has been recognized in numerous other cases. See *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Edwards v. California*, 314 U.S. 160, 174, 62 S.Ct. 164, 167, 86 L.Ed. 119 (1941); *South Carolina Highway Dept. v. Barnwell Bros.*, 303 U.S. 177, 184–85 n. 2, 58 S.Ct. 510, 514 n. 2, 82 L.Ed. 734 (1938). The concept that absence of political restraints calls for more careful judicial review has also

One of the most cogent applications of this principle, particularly in point in the present case, arose in *Nippert v. City of Richmond*, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946), in which a locality required licensing of local salespeople engaged in solicitation. The Court found that this requirement and an accompanying tax amounted to a discriminatory barrier to interstate commerce. The law, according to Justice Rutledge writing for the Court, "inherently involves too many probabilities, and we think actualities, for exclusion of or discrimination against interstate commerce, in favor of local competing business, to be sustained ..." *Id.* at 434, 66 S.Ct. at 595. The Court noted that "[p]rovincial interests and local political power are at their maximum weight in bringing about acceptance of this type of legislation." *Id.*

The Commerce Clause authorizes congressional action, but it also has self-executing functions. It authorizes congressional action to protect or regulate commerce, even where the activities affected impact upon such commerce only in the aggregate.[12] It bars—and has long been construed as intending to bar—state or local regulation which discriminates against interstate commerce unless there is a clear local need which cannot be satisfied except by such regulation, or unless Congress has approved the regulation specifically or in principle. See *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) (Marshall, C.J.); see also *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851).

■ The Commerce Clause is not dormant but vigilant: it protects the "national common market" from local trade barriers. *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). Its primary focus is the prevention of state or local discrimination against interstate activity. See *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987) (Powell, J.). But judicial implementation of the Clause has extended well beyond this primary focus; it has long been interpreted as barring undue interference with interstate commerce even if no discrimination is involved, where no significant local need justifies such interference. See *Raymond Motor Transp. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).[13]

■ Impermissible discrimination against commerce does not occur only where such discrimination is explicit; indeed indirect means are often utilized in efforts to bypass constitutional protections against discrimination of various kinds.[14] It is enough to offend the Commerce Clause if a state or local requirement has a discriminatory effect against interstate commerce and is not offset

been applied in other contexts where broadly phrased constitutional provisions are to be interpreted. See *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938). This element is only a factor and is never independently dispositive. See Powell, "Carolene Products Revisited," 82 Colum.L.Rev. 1087 (1982).

**12.** See *Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985); *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975); *Polish National Alliance v. NLRB*, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944); *NLRB v. Fainblatt*, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1939); *United States v. Ricciardi*, 357 F.2d 91 (2d Cir.), cert. denied 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966).

**13.** Some courts have recently challenged this traditional interpretation as entailing the exercise of a function by the judiciary too much akin to that of a legislature—balancing conflicting interests involved with no specific guidelines. See *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496 (7th Cir.), cert. denied 493 U.S. 955, 110 S.Ct. 367, 107 L.Ed.2d 353 (1989).

This issue need not be considered here. The interpretation of New York's licensing law urged by the Village would discriminate against interstate commerce and constitute an undue burden on such commerce.

**14.** See *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915); *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (dealing with subterfuges employed to deny voting rights protected by the Civil War Amendments).

by any legitimate local need. See *Hunt, supra; Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *Farmland Dairies v. Commissioner,* 650 F.Supp. 939 (E.D.N.Y.1987); see *Underhill Associates v. Coleman,* 504 F.Supp. 1147 (E.D.Va.1981), *aff'd* 674 F.2d 293 (4th Cir.1982). Where a seemingly neutral requirement imposes an unequal burden on interstate activity: "... the burden falls on the state to justify [the requirement] both in terms of local benefits flowing from the [restriction] and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). Here, there is no indication that any local interest such as public safety would be furthered by a dual licensing requirement. Thus no deference to legislative judgment could be called for in this case because there is no occasion for such deference: no text enacted by New York's lawmakers states that both a contractor and the party implementing a contract must be licensed.

One traditional reason for caution in interposing judicial interpretation of constitutional provisions—that the judicial word is the last one short of adoption of a constitutional amendment—does not apply to the context before me. In Commerce Clause cases, Congress has the last word by virtue of the Clause itself; it can—and on occasion does—modify dispositions made by the judiciary. See *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); Dowling, "Interstate Commerce and State Power: Revised Version," 47 Colum.L.Rev. 547 (1947). With respect to the constitutional thrust of the Commerce Clause courts are the first rather than the ultimate voice to be heard.

## VII

■ The Privileges and Immunities Clause contained in Article IV § 2 of the Constitution protects the right of citizens to engage in legitimate professional activity throughout the United States without geographic restrictions. *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985); see also *Barnard v. Thorstenn,* 489 U.S. 546, 109 S.Ct. 1294, 103 L.Ed.2d 559 (1989); *Frazier v. Heebe,* 482 U.S. 641, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987); *Baldwin v. Montana Fish & Game Comm'n,* 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978). Exercise of this right could be impeded if one had to be licensed to engage in making contracts with entities in a state, even if those who are to implement the contracts have whatever certification the state reasonably requires.[15]

■ To adopt an interpretation of state law which would discriminate against interstate commerce without justification would involve the judiciary in effectuating an unconstitutional restraint. This would run contrary not only to the Commerce Clause of the Constitution, but also to the Supremacy Clause, Article VI, clause 2, which is applicable to all courts, federal or state, and which makes the Constitution "the Supreme Law of the Land". See *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

## VIII

The Village argues that the Texas company's complaint is time-barred under N.Y.Civ. Prac.L. & R. § 9802, precluding actions against the Village unless commenced within 18 months after the cause of action accrued.

Accrual depends on when it became clear to the Texas company that it would not be paid, thus triggering its need and right to sue. Placing that time at the earliest possible point might help the Village in this litigation, but militate to the disadvantage of both it and other municipalities in contracting generally. This paradoxical effect arises because a short time frame within which contractors must sue or forever hold their peace would tend to lead contractors to sue earlier rather than to negotiate. Only through earlier resort to litigation could they avoid the

---

**15.** If such contractors wished to compete in a "national common market," such a licensing requirement would as a practical matter dictate that they secure such licenses, in advance, from practically every state.

risk of time bar. Those which did enter the market for municipal contracts would be required to charge higher prices to reflect the risk of being unable to secure payment.

If confusion existed as a result of any positions taken or warnings omitted by the Village concerning the Texas company's entitlement to payment for its work under its contract with the Village, delay on the part of the contractor may be excused. It is a basic principle that one cannot take advantage of problems one has been responsible for creating; hence, "equitable estoppel has been applied to prevent a defendant from relying on a limitations bar if that defendant has contributed to the confusion." *Schrader v. Royal Caribbean Cruise Lines*, 952 F.2d 1008, 1013 (8th Cir.1991); see *Gallagher v. Donald*, 803 F.Supp. 899 (S.D.N.Y.1992), *reaff'd* 805 F.Supp. 221 (S.D.N.Y.1992).

The intricate series of obliquely colliding communications between the parties does not permit, on the papers before me, a definitive finding as to when plaintiff's cause of action accrued.

## IX

■ The Village contends that the Texas company cannot recover for its work because of failure to file a notice of claim with the Village Clerk within one year after the claim accrued under N.Y.Civ.Prac.L. & R. § 9802. Such requirements are pragmatic, aimed at assuring that public sector entities with their deep pockets are not surprised by strike litigation which they can no longer investigate or settle effectively. See *Goldman v. New York City Health & Hospitals Corp.*, 186 A.D.2d 629, 588 N.Y.S.2d 412 (2d Dept. 1992), arising under the similar provisions of Gen.Municipal Law § 50–e.

It has long been a traditional and indeed basic principle of New York law that, absent a contrary indication in their text, documents should be given an interpretation in accordance with their objectives rather than in a wooden manner. *Tedla v. Ellman*, 280 N.Y. 124, 19 N.E.2d 987 (1939); see also *Zendman v. Harry Winston, Inc.*, 305 N.Y. 180, 189 n. 3, 111 N.E.2d 871 (1953).

Consequently, notice of claim requirements may be satisfied if equivalent information is timely furnished. The Texas company has shown sufficient indications that this was done to survive the Village's motion for summary judgment on this issue. *Quintero v. Long Island RR*, 31 A.D.2d 844, 298 N.Y.S.2d 109 (2d Dept.1969); *Frink v. Town of Amenia*, 91 Misc.2d 491, 398 N.Y.S.2d 331 (Cy.Ct.Dutchess Co.1977).

## X

■ The Village argues that the Texas company is illegally doing business in New York without having registered under N.Y.Bus.Corp.Law § 1312. It supports this contention by referring to the Reply Affidavit submitted on behalf of the Village, claiming that the Texas company had numerous unspecified meetings with the New York State Department of Environmental Conservation. This is an insufficient basis to dismiss the complaint.

*Netherlands Shipmortgage Mortgage Corp. v. Madias*, 717 F.2d 731 (2d Cir.1983), indicates that door-closing statutes should be applied cautiously. The Second Circuit in *Netherlands* noted that New York, cognizant of the importance to the state of interstate commerce, has required considerable localized activity to trigger such provisions.[16]

## XI

A striking aspect of this litigation as presented by the motions of the parties is the paucity of material relating to the underlying merits of the dispute even by way of back-

---

**16.** The Village asks me to assume that any remedy for borderline noncompliance of a doing-business statute is inevitably to be imposed on an all-or-nothing basis irrevocably fatal to this action, rather than merely requiring the Texas company to cure the lapse before pursuing this action further. Such an assumption runs counter to the increasing judicial recognition that remedies should fit the circumstances rather than be im-

posed based on pressing facts into yes-or-no pigeonholes leading to an all-or-nothing result. See *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (Stewart, J. for unanimous Court); *TIAA v. Coaxial Communications*, 799 F.Supp. 16 (S.D.N.Y. 1992); *later decision*, 807 F.Supp. 1155 (S.D.N.Y.1992).

**1126**

ground. The parties are directed to renew settlement efforts and to be prepared to report success or the obstacles encountered at a pretrial conference to be held on Thursday July 15, 1993 at 10 AM.

SO ORDERED.