**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   CC-13-1578-BlPaKu |
| ) | |
| KAREN FORMAN MCALLISTER, ) | Bk. No.   1:12-BK-20052-AA |
| ) | |
| Debtor. ) | Adv. No.   1:13-AP-01045-AA |
| _____ ) | |
| KAREN FORMAN MCALLISTER, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| KRENGEL SPAMER & VANCE, LLC, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued on June 26, 2014, at Pasadena, California
Submitted on July 18, 2014

Filed - August 13, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Alan M. Ahart, Bankruptcy Judge, Presiding

_____

Appearances:     Gary E. Klausner of Levene, Neale, Bender, Yoo &
Brill LLP argued for appellant Karen Forman
McAllister; J'aime Williams argued for appellee
Krengel Spamer & Vance, LLC.

_____

Before: BLUMENSTIEL,[**] PAPPAS, and KURTZ, Bankruptcy Judges.

_____

     [*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

     [**] The Honorable Hannah L. Blumenstiel, Bankruptcy Judge for the Northern District of California, sitting by designation.

Appellant-Debtor Karen F. McAllister ("McAllister") appeals a summary judgment denying her discharge under sections 727(a)(2)(A)[1] and 727(a)(3) based upon claims brought by Appellee-Creditor Krengel, Spamer & Vance, LLC ("Krengel"). Upon de novo review, we conclude that Krengel failed to meet its burden of establishing a prima facie case under section 727(a)(3), and that the record gives rise to a genuine issue of material fact as to the requisite intent under section 727(a)(2). Accordingly, we REVERSE the summary judgment and REMAND for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

**A. Pre-petition events**

McAllister is the sole shareholder of a California corporation, KFM Management, Inc. ("KFM"), which was incorporated in or about July 2010. KFM's principal place of business is Los Angeles County, California. Through KFM, McAllister works as a talent manager in cooperation with talent agencies or agents, providing services akin to career guidance to actors. In exchange for its services, KFM receives ten percent of the client's gross income.

KFM does not enter into written contracts with its individual clients; all agreements are verbal. KFM also works with multiple talent agencies, and may enter into an oral or written contract for KFM's management services depending on the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as Civil Rules.

-2-

agency.

Krengel is a California limited liability company located in Los Angeles, California, doing business as Domain. Krengel employed McAllister from approximately January 2008 to July 2010.

In June 2011, McAllister filed suit against Krengel in the Los Angeles County Superior Court, case number BC462838 (the "State Court Action"). McAllister filed the State Court Action individually, and did not include KFM as a co-plaintiff, apparently because McAllister did not form KFM until after her causes of action arose. The State Court Action alleged: nonpayment of wages, violations of the California Labor Code, breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, breach of implied covenant of good faith and fair dealing, violation of the California Business and Professions Code, and quantum meruit.

The State Court Action went to trial in May 2012. On November 12, 2012, the state court entered an Amended Judgment on Special Verdict ("Judgment"). The state court entered the Judgment in favor of McAllister and against Krengel on two causes of action in the complaint, awarding McAllister damages of $1,808.78. However, the state court also found in favor of Krengel and against McAllister on four causes of action, determined Krengel to be the prevailing party, and awarded Krengel attorneys' fees and costs in the amount of $276,976.35 plus interest at 10% per annum from June 7, 2012.

-3-

**B.    McAllister's bankruptcy filing**

On November 14, 2012, two days after entry of the Judgment, McAllister filed a voluntary bankruptcy petition for relief under chapter 7 of the Bankruptcy Code.  Along with her petition, McAllister filed schedules of assets and liabilities and a Statement of Financial Affairs ("SOFA").  In Schedule B — Personal Property, McAllister scheduled the following assets:

| Description | Stated Value |
| --- | --- |
| • Personal Jewelry | $1,000 |
| • 100% interest in KFM | $2,500;[2] |
| • 2001 Mercedes E320 | $7,500 |
| • 2003 Toyota Sequoia | $5,000;[3] |

On January 4, 2014, McAllister filed an amended Schedule B which increased the value of her personal jewelry to $8,000 and increased the value of KFM to $12,500.

McAllister disclosed $5,000 in monthly income from the operation of KFM in Schedule I — Current Income of Individual Debtor(s).  In Schedule J — Current Expenditures of Individual Debtor(s), McAllister listed $3,086 at line 16 for "regular expenses from operation of business, profession, or farm."  In accordance with the instructions pertaining to line 16,

---

[2] McAllister noted in Schedule B that KFM's 20 clients do not have written contracts with KFM and can leave at any time; KFM's value is based on McAllister's ability and reputation, and has no liquidation value other than the bank account balance.

[3] McAllister noted in Schedule B that "[p]roperty was acquired by non-filing spouse prior to the couple's marriage in 2005 and would constitute his separate property" and identified the Toyota as community property.

McAllister attached a detailed statement itemizing KFM's monthly business expenses, which include $1,900 for "Legal."

In Schedule F — Creditors Holding Unsecured Nonpriority Claims, McAllister listed a debt owed to Krengel, incurred in 2009 in the amount of $276,976.35, which she identified as "disputed." McAllister also identified a debt owed to "Taylor/Anderson" as a personal loan in the amount of $8,000.

McAllister signed a Declaration Concerning Debtor's Schedules, affirming under penalty of perjury that she reviewed the schedules and that they were true and correct to the best of her knowledge, information, and belief.

McAllister's SOFA included the following disclosures:

- $56,997 gross income from KFM year to date in 2012 (net income of approximately $23,000).
- $16,469 gross income from KFM in 2011 (net loss of $14,472).
- $31,000 gross income from talent management (unincorporated) in 2010.
- No payments exceeding $600 on loans, installment purchases of goods or services, and other debts to any creditor within 90 days immediately preceding the commencement of the case.
- No payments within one year immediately preceding the commencement of the case to or for the benefit of creditors who are or were insiders.
- The 2011 short sale of a prior residence in Tarzana, California to an unrelated third party.

McAllister signed her SOFA, declaring under penalty of perjury that she had read the responses therein and that they were true and correct.

The meeting of creditors took place on December 20, 2012. McAllister testified at the meeting that the bankruptcy schedules were true to the best of her recollection.

**C.   Krengel's complaint and motion for summary judgment**

On February 19, 2013, Krengel filed a complaint seeking denial of McAllister's discharge pursuant to sections 727(a)(2), (a)(3), (a)(4), (a)(5), and (a)(7) ("Complaint").  In the Complaint and the subsequent Motion for Summary Judgment (the "Motion"), Krengel contends that McAllister purposefully misrepresented her assets, liabilities, and other financial information in her bankruptcy schedules and SOFA, and that these alleged misrepresentations, along with other acts or omissions, are evidence of wrongful intent.  Krengel questioned McAllister about each of these issues during a Rule 2004 examination of McAllister in January 2013.  Krengel's specific allegations, along with McAllister's explanations as given during her Rule 2004 examination or her declaration in opposition to the Motion, are set forth below.

**1.   Prior bankruptcies**

Krengel asserts and McAllister readily concedes that she and/or her non-filing spouse, Paul McAllister, have filed a total of four bankruptcy cases.  Although Krengel sets forth the facts of the prior bankruptcies in the Motion, and includes them in the findings of fact, Krengel does not assert anywhere in the Motion or in its reply that the prior bankruptcies bear upon any of the causes of action.  We address this issue here only because our review is de novo.

Paul McAllister filed bankruptcy petitions in 1995 and 1996.

The couple filed a joint petition under chapter 13 in 2011, which was dismissed one month later. McAllister filed the instant case on November 14, 2012.

McAllister stated during her Rule 2004 examination that her husband filed two bankruptcies before they knew each other and that she knew nothing about those cases. McAllister also explained why she and her husband filed the chapter 13 case in 2011: their home was in foreclosure and an attorney advised them that by filing bankruptcy, they could buy some time to find a new place to live. On this advice, they filed a joint petition, found a home to rent, and allowed their case to be dismissed.

**2.   Value of wedding ring**

Krengel asserts and McAllister concedes that she did not include the value of her wedding ring in her original Schedule B.

At the meeting of creditors, Krengel asked whether her reference to "Personal Jewelry" in Schedule B included her wedding ring, and McAllister responded that it probably did not. McAllister agreed to amend Schedule B. After the meeting of creditors, McAllister had her wedding ring appraised and determined it had a value of $8,000. She then amended Schedule B to increase the value of her jewelry from $1,000 to $8,000.

McAllister does not explain why she did not include the value of her wedding ring in the original Schedule B, but notes that the Trustee did not object to her claim of exemption with respect to the ring or pursue recovery of that asset.

**3.   Scheduling of debt owed to Krengel**

Krengel asserts that McAllister "falsely stated" in Schedule F that she incurred the Krengel claim in 2009. Although

-7-

McAllister identified the Krengel claim as "disputed," she admits that the debt is based on a final judgment, as detailed below.

McAllister affirms in her declaration that she identified the debt as "disputed" on advice of counsel. Her state court attorney advised her that the state court might have erred in determining that Krengel was the prevailing party entitled to attorneys' fees and costs because she had prevailed on two causes of action; however, she acknowledges in her declaration that the deadline to appeal the state court judgment had passed by the time she filed her bankruptcy petition. During the Rule 2004 examination, Ms. Cohen, Krengel's counsel, questioned McAllister about her characterization of the Krengel debt as "disputed" and the following exchange took place:

Q: Okay. So I'm trying to figure out why you are saying it is a disputed claim when they actually got a judgment in that amount.

A: They did, but I don't have anywhere near that money to pay them off. That's why I'm disputing it.

Q: Well, do you have the money to pay off Alan Meyers?

A: No.

Q: Okay. But you didn't list him as disputed?

A: Oh, I don't know what the difference between disputed or – it's marked or not marked.

Mr. Hagen [McAllister's Counsel]: Does it really matter?

Q: I'm just trying to figure out if there's any reason to dispute a liquidated debt that's reduced to a judgment. I mean, you might not like it but –

A:  Well, it's a huge number.  You know, we're not talking about $4,000.  Alan Meyers, I owe $4,000.  This is almost $300,000.

Q:  So you dispute it because it's so big?

A:  Yes.

Q:  Okay.  But you do acknowledge that they have a judgment against you for that amount?

A:  I am very aware of that, yes.

Q:  Okay.  So is it fair to say that you may not like the fact that you owe the money, but you do acknowledge that there is really no basis to dispute it at this time; correct?

A:  I don't really understand the question.  I mean, that will go into a whole personal reason as to why I don't feel like I should be responsible for it.

Mr. Hagen:  To answer your question, it is a judgment.

A:  It's a judgment.  It is what it is.

2004 Exam Transcript pp. 37-38.

Ms. Cohen also asked why McAllister indicated in Schedule F that she incurred the Krengel debt in 2009:

Q:  Why did you state that was incurred in 2009, if you remember?

A:  I don't.  I mean, if the judgment was final — which it was just recently final in September of 2012, I don't know why it would say 2009.

Mr. Hagen:  Technically, 2008, that's when she left the employment and the dispute arose.

-9-

Q: Well, actually, let's go briefly into that issue. You left Domain in 2008; is that right?

A: No. No. No. I started, I believe, in 2008. I left Domain in July 2010.

Q: Okay, so there is no tie-in into the 2009 date is there?

A: No.

Q: Okay.

Mr. Hagen: I'm reading the Complaint. The Complaint says beginning of January 2008 and continued employment to July 2008.

A: That's a mistake in there.

Mr. Hagen: I'm just reading the Complaint.

2004 Exam Transcript p. 46.

McAllister explained that this misstatement resulted from carelessness and not from an intent to mislead any party in interest, to hide any information, or to compromise the rights of creditors. McAllister further stated that she viewed the misstatement as benign and of no consequence to the administration of the bankruptcy estate.

**4.    Scheduling of debt owed to "Taylor/Anderson"**

Taylor/Anderson represented McAllister in the State Court Action on a contingency basis. McAllister incorrectly scheduled an $8,000 debt owed to "Taylor/Anderson" as a personal loan when it was actually a debt owed for legal costs.

At the Rule 2004 examination, Ms. Cohen questioned McAllister about the Taylor/Anderson debt:

Q:  . . . [I]f you go to Schedule F . . . it shows that

-10-

you owe them $8,000 for a personal loan . . . Can you explain to me the relationship between this $8,000 scheduled amount, the $11,000 or so that they charged, and the amount that you paid to them?

A: If I understand the question, I had made some payments. This is what I owe them based on the $11,000 that's on the form you have, plus an additional – I paid 4 or 5 after for the trial cost. I remember the total being about $19,000 total in what I needed to pay them. So the $8,000 is the remainder that is due.

Q: Okay. That was just a misstatement. Where it says "personal amount," it was incorrect?

A: Yeah, that's not correct. It was legal expenses.

2004 Exam Transcript pp. 103-104.

McAllister attested that this misstatement also resulted from carelessness rather than an intent to mislead any party in interest, to hide any information, or to compromise the rights of creditors. McAllister stated that she viewed the misstatement as benign and of no consequence to the administration of the bankruptcy estate.

**5.    Non-disclosure of transfer of diamond necklace**

McAllister's SOFA failed to disclose that, in 2012, she gave her brother a diamond necklace valued at $7,000, allegedly in satisfaction of a loan. Instead, the SOFA indicated that McAllister did not transfer any assets or make any payments to or for the benefit of creditors who were insiders in the year preceding the petition date. Krengel also asserts that McAllister has no evidence of a loan from her brother.

-11-

In her defense, McAllister explained that she did not understand the meaning of "insider" when she checked "none" in response to SOFA question 3c, which calls for disclosures to insiders. She readily disclosed the transfer when asked about it at the meeting of creditors.

As to the loan itself, McAllister testified at the Rule 2004 examination that she borrowed $7,000 from her brother in late 2011. They did not enter into a written agreement. She gave the diamond necklace to him as payment for that loan in July 2012, following trial of the State Court Action. She estimated its value at $7,000. About ten years prior, it had been insured for $10,000.

### 6. Loans or gifts from parents

Krengel asserts that McAllister's SOFA does not disclose approximately $60,000 given to McAllister by her mother between 2010 and mid-2012. Krengel further asserts that McAllister has inconsistently claimed that the $60,000 was a loan (constituting an undisclosed liability), a forgiven debt (constituting undisclosed income), or a gift (constituting an undisclosed gift). Finally, Krengel asserts that McAllister has no records of an alleged loan from her mother.

During the Rule 2004 examination, McAllister admitted that her mother loaned her $50,000 or $60,000 between 2010 and mid-2012, but explained that, after she "lost the case," her mother told her the $60,000 was a gift that would be deducted from McAllister's future inheritance.

When Ms. Cohen asked McAllister if she intended to report the debt forgiveness as income, the following exchange took

-12-

place:

> Q: Are you intending to report that forgiveness income for that?
>
> A: I don't know what that is.
>
> Q: Well, I guess I can tell you. You can give me your best answer that you can. If a debt is forgiven, then that creates a taxable event because you no longer have to pay it back. So the question is whether you'll be scheduling in your tax return the fact that this debt was forgiven, as an income event, if you know?
>
> A: I don't know. We haven't met with our accountant, so I don't know.

2004 Exam Transcript p. 80.

In her declaration, McAllister attested that she did not disclose the funds received from her mother in her Schedule F or SOFA because her mother told her she did not need to repay them.

### 7.   **Automobiles**

McAllister listed on her amended Schedule B a 2001 Mercedes Benz automobile and a 2003 Toyota Sequoia automobile. Krengel asserts that McAllister misrepresented information about the automobiles in Schedule B.

During the Rule 2004 examination, McAllister explained that her "in-laws" bought the 2001 Mercedes for her for $10,000 in 2011. McAllister valued the Mercedes at $7,500 based on an estimate she obtained from Carmax. Krengel contends that this testimony is inconsistent with her testimony at a deposition in the State Court Action: that she bought a 2002 Mercedes Benz for $12,000 in 2010.

-13-

As evidence of this alleged inconsistency, Krengel offers the first declaration of Joe Vance, which attests to statements McAllister allegedly made at a deposition taken in the State Court Action.[4]  Krengel introduced the 280-page deposition transcript (the "Deposition Transcript") as an exhibit to the second Joe Vance declaration.  Mr. Vance, however, may not have been present at the deposition, as the Deposition Transcript notes the appearance of a "John Vance," but not of a "Joe Vance." In addition, Krengel never provided a citation to the location of McAllister's allegedly inconsistent statement within the Deposition Transcript, and this Panel could not locate one.[5]

McAllister testified that the Toyota Sequoia is her husband's car, that he bought it in 2003 before they were married, and that she has no idea how much he paid for it.  The Toyota was not fully paid off when McAllister and her husband married, and the remaining car payments were made with community property.  Amended Schedule B identifies the Toyota as both community property and McAllister's husband's separate property. McAllister swears that the characterization of the Toyota as constituting her husband's separate property was not the result of her intention to mislead any party in interest, to hide any information, or to otherwise impede the administration of the

---

[4] The first Vance declaration was filed in support of the Motion.  The second Vance declaration was filed in support of Krengel's reply.

[5] Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679,  686 (9th Cir. BAP 2006) (appellate courts are not required to search an entire record, unaided, for error).

-14-

estate.

**8. Disclosure of foreclosed property**

McAllister does not dispute that she incorrectly reported on her SOFA a short sale of her prior residence when in fact she lost the property to foreclosure.

The following exchange took place between Ms. Cohen, McAllister, and Mr. Hagen during McAllister's Rule 2004 examination:

> Q: Now, in your statement of financial affairs . . . It indicates that the Monard Place property – that's where you used to live; right?
>
> A: Yes.
>
> Q: It says that it was a short sale. But was there a short sale or [a] foreclos[ure]?
>
> A: No, it was foreclosed on.
>
> Mr. Hagen: That was my mistake.

2004 Exam Transcript p. 98

In her declaration, McAllister stated: "the misstatement regarding the nature of the sale is embedded in our attempt to effect a short sale following receipt of the default notice. These attempts to conclude a short sale proved futile, and . . . the property was ultimately lost by way of the foreclosure process." McAllister Decl. ¶ 31. McAllister further stated, "[m]y confusion as to the means by how our home 'was lost' was not the result of my intention to mislead any party [in] interest, to hide any information or to otherwise act in a manner that would compromise the rights of creditors." Id.

### 9. Value of KFM

Between her original and amended Schedule B, McAllister adjusted the value of her 100% interest in KFM from $2,500 to $12,500. Krengel asserts that the conflicting valuations of her company are evidence of McAllister's wrongful intent. At McAllister's Rule 2004 examination, Ms. Cohen asked why she changed the value of KFM:

> A: I'm not sure why that was changed, unless we were anticipating that a client is going to be paying me on a job, so — which we didn't know when we originally filed. That number might have gone up a little bit.
>
> Q: What customer made you change the valuation?
>
> A: Well, I no longer represent this client. Actually, your client represents her. Her name is Vivian Bang, and I put her on a series. And I know the show has been picked up, so she should be paying me even though I don't represent her anymore. But I'm not sure if she was legally picked up to be a part of the show. So that would increase it . . . .
>
> Q: Approximately when did you find that out?
>
> A: The end of the year or maybe just after the first of the year.
>
> Q: And that was the basis of your changing the valuation of the company?
>
> A: I believe so.
>
> Q: Okay. Was it a guesstimate? I mean, how do you —
>
> A: Yeah, it's a guesstimate.

2004 Exam Transcript pp. 54-56.

Consistent with this testimony, McAllister stated in her

-16-

declaration that she amended Schedule B to increase the liquidation value of KFM to $12,500 "based upon possible additional revenue from a client arising from her being cast in an upcoming television series." McAllister Decl. ¶ 15.

**10. KFM income and expenses included in Schedules I and J**

McAllister included $5,000 per month business income in Schedule I and $3,086 per month business expenses in Schedule J. The attachment to Schedule J indicates that these business expenses include "gifts and entertainment for clients," "office expenses," "corporate taxes," and "legal fees." KFM, however, is a separate corporate entity. The $1,900 monthly legal fees expense represents McAllister's personal legal fees, which KFM is no longer paying. Krengel asserts that McAllister wrongfully inflated her personal expenses by including KFM business expenses.

McAllister testified that she (through KFM) is no longer paying $1,900 per month in legal fees and that the last such payment took place in October or November 2012. She stated that she included the legal fees as an expense because she had paid it throughout most of the year and, in preparing for her bankruptcy filing, her counsel asked her for an estimate of her year-to-date expenses.

In her declaration, McAllister confirmed that she included KFM's monthly business expenses in Schedule J upon the advice of her counsel, who told her that although the information is not required, many trustees request it. McAllister further stated that she did not intend to mislead any party in interest, to hide any information, or otherwise impede the administration of the

-17-

estate.

**11.  Payments to creditors within 90 days of petition**

McAllister's SOFA indicates that she made no payments to creditors in the 90 days preceding the petition date, November 14, 2012.  Krengel points out that McAllister stated during her Rule 2004 examination that KFM stopped making payments on her behalf for legal fees in October or November 2012. Krengel contends that McAllister should have disclosed KFM's payment of her legal bills in the SOFA.

McAllister offered the following explanation during her Rule 2004 examination:

> Q:  And you didn't list the payments to D2 – Taylor
> Anderson or D2 in your statement of affairs because that was
> paid by the corporation; is that right?
>
> A:  I believe so.

2004 Exam Transcript p. 42.

> Q:  [O]n your statement of affairs it says . . . "list
> each payment or other transfer to any creditor made within
> 90 days immediately preceding the commencement of the case"
> . . . . And you put "none."  Is that because you didn't pay
> anyone within the 90 days or because you thought since KFM
> paid it, you didn't need to list it?
>
> A:  I don't think I paid anybody three months before I
> filed bankruptcy.

2004 Exam Transcript pp. 115–16.

There is no other evidence in the record concerning payments to creditors within 90 days pre-petition and no evidence that McAllister made any such payments.

**12. KFM's payment of McAllister's personal legal fees**

Krengel points out that McAllister's schedules and SOFA do not indicate any debt owed to KFM, nor any gifts from KFM, on account of its payment of her legal fees. Krengel asserts that McAllister should have accounted for Krengel's payment of her legal fees as either debt or income. McAllister, however, disclosed $5,000 monthly income from her business on Schedule I.

When asked why KFM paid her legal fees as opposed to her paying them personally, McAllister responded: "[B]ecause I couldn't pay anybody out of my account with my husband, because we didn't have — we were using that money to live on. So his salary is based on every expense we were paying. So any money that I had coming into the KFM was money I was putting towards the lawsuit. So I just took the money out of there." 2004 Exam Transcript pp. 114-15; 118. Ms. Cohen asked if KFM's books reflected the payment of legal fees by KFM as McAllister's income, and McAllister responded affirmatively.

With respect to how KFM's payment of the legal fees were reported on KFM's corporate and McAllister's personal tax returns, McAllister stated, "I'm not sure how my accountant listed things. I know we put it on corporation taxes, what I had made, but he knew that I spent all the money in legal fees. So I don't know how he listed it." 2004 Exam Transcript p. 119.

While testifying concerning KFM's 2011 corporate tax return, McAllister stated, "If I am looking at it correctly, it says $16,469 was my income. So that would have been my income. And I'm sure all of that went to my legal expenses because they were more than that." 2004 Exam Transcript pp. 119-120. She further

stated, "My accountant didn't think that was a problem that I – when I told him that I was paying right out of my KFM account, he said that was fine." Id.

### 13. Non-disclosure of executory contracts on Schedule G

McAllister did not schedule KFM's executory contracts on Schedule G. Krengel asserts that McAllister should have disclosed KFM's contracts with clients and talent agencies.

During her Rule 2004 examination, McAllister testified that KFM has numerous ongoing executory contracts with clients at various talent agencies. Consistent with her prior testimony, McAllister declared that she is not party to any executory contract or unexpired lease; the contracts she described during the Rule 2004 examination are between KFM and the clients.

### 14. Books and records

Krengel asserts that McAllister failed to keep or preserve any recorded information, including books, documents, records, and papers, regarding (1) loans or gifts from her mother and brother, and (2) transactions between herself and KFM. Krengel contends the alleged failure to maintain records warrants relief under section 727(a)(3).

During her Rule 2004 examination, McAllister testified about her personal and corporate tax returns. She also discussed the contracts between KFM and its clients, KFM's lease, and that she kept the books for KFM. And she discussed the lack of documentation of the alleged loan from her brother. At no point during the Rule 2004 examination did Krengel's attorney question McAllister about her personal record-keeping practices, or those of KFM. Likewise, McAllister's record-keeping practices are

-20-

never discussed in the Deposition Transcript, or any of the declarations supporting Krengel's motion for summary judgment.

**D.    Summary judgment proceedings**

Krengel filed the Motion on September 25, 2014.  Evidence submitted by Krengel included the declaration of Joe Vance, who is a principal of Krengel; the bankruptcy petition, schedules, and SOFA; and the transcript of the Rule 2004 examination. McAllister opposed the Motion and objected to the Vance declaration.  Evidence submitted by McAllister included her declaration, a June 8, 2012 Partial Judgment on Special Verdict entered in the State Court Action, and the November 12, 2012 Amended Judgment on Special Verdict.  Krengel filed a reply and a second declaration from Joe Vance, which included the Deposition Transcript.  McAllister also objected to the second Vance declaration and the Deposition Transcript.

The bankruptcy court issued the following tentative ruling prior to the hearing on the Motion:

> "Grant the motion under (Sec.) 727(a)(2) and (a)(3) because the debtor transferred, removed or concealed the necklace with intent to hinder of delay creditor within one year before the petition was filed and because the debtor failed to keep or preserve recorded information of loans or gifts from her mother, a loan from her brother and transactions between herself and KFM."

Appellant Brief p. 9.  The tentative ruling did not otherwise address the evidentiary objections.

At the hearing on the Motion, the bankruptcy court adhered to its tentative ruling, and in doing so granted the Motion,

-21-

denied McAllister's discharge pursuant to sections 727(a)(2) and (a)(3), and overruled her evidentiary objections. The bankruptcy court then instructed Krengel to prepare and submit an order that included specific findings of fact and conclusions of law.

McAllister objected to the findings in paragraphs 1 through 24 of Krengel's proposed order. Krengel responded to the objection, stating: "The only material fact that the Debtor denied was with respect to her intent when she gave her brother her diamond necklace on the eve of bankruptcy and then failed to schedule that in her bankruptcy filings. The Court found the Debtor's assertions that she forgot about the diamond necklace, and/or didn't realize her brother was an insider, not to be credible." Response to Opposition to Proposed Order p. 2.

The bankruptcy court entered Krengel's proposed order[6] and McAllister filed this timely appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1)(J). We have jurisdiction under 28 U.S.C. § 158.[7]

---

[6] It appears that the proposed order was entered without any changes. Krengel's proposed order is not included in the excerpts of record, nor is it available from the adversary proceeding docket. However, the upper left corner of the order granting summary judgment indicates that the signed order was prepared by counsel for Krengel.

[7] At oral argument in this appeal, the Panel noted that the order on appeal was interlocutory because it did not resolve all of appellant's claims and therefore was not a final judgment. On June 30, 2014, the Panel entered an order of limited remand directing appellant to obtain an amended judgment from the

continue...

-22-

# III. ISSUES

1. Did the bankruptcy court abuse its discretion in overruling McAllister's evidentiary objections?

2. Did the bankruptcy court err in determining that there was no dispute of material fact with respect to the requisite intent to hinder, delay, or defraud her creditors under section 727(a)(2)(A)?

3. Did the bankruptcy court err in determining that there was no dispute of material fact with respect to McAllister's failure to keep and maintain records under section 727(a)(3)?

# IV. STANDARD OF REVIEW

The Panel reviews a bankruptcy court's grant of summary judgment de novo. Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 760 (9th Cir. 2008).

In reviewing an order granting summary judgment, the Panel "must view the evidence in the light most favorable to the non-moving party and 'determine whether there are any genuine issues of material fact and whether the bankruptcy court correctly applied the substantive law.'" Id. (quoting Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1966)). A material fact is one that, under governing substantive law could affect the outcome of the case. Id. A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 761. Findings

_____

[7]...continue
bankruptcy court to resolve the finality issue. On July 16, 2014, the bankruptcy court entered its amended judgment, which the Panel has found to be a final, appealable judgment over which it has jurisdiction.

-23-

of fact made in summary judgment proceedings are not entitled to the "clearly erroneous" standard of review because the trial court has not weighed the evidence or resolved disputed factual issues. Am. Fed'n of State, County and Municipal Employees, Local 2051 v. Stephens (In re Stephens), 51 B.R. 591, 594 (9th Cir. BAP 1985).

Plaintiff bears the initial burden of setting forth credible evidence to support each element of the claim. "[W]hen a creditor makes out a prima facie case, the debtor who fails to respond with credible evidence cannot prevail in a discharge case." Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 273 (9th Cir. BAP 1990)(citing Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985)).

A trial court's exclusion of evidence in a summary judgment motion is reviewed for an abuse of discretion. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)(citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141, (1997)). It follows that we must affirm the trial court unless its evidentiary ruling was manifestly erroneous and prejudicial. Orr, 285 F.3d at 773 (citing Joiner, 522 U.S. at 142; Maffei v. N. Ins. Co., 12 F.3d 892, 897 (9th Cir. 1993)).

## V. DISCUSSION

**A.    The Bankruptcy Court did not abuse its discretion in overruling McAllister's evidentiary objections**

McAllister filed two evidentiary objections prior to the bankruptcy court's ruling on the Motion. McAllister's first objection attacked several pieces of evidence Krengel offered in support of its Motion. In response to McAllister's opposition to

-24-

the Motion and her first evidentiary objection, Krengel filed a reply that included a new declaration, which introduced the Deposition Transcript. McAllister objected to the new evidence included with the reply declaration. The bankruptcy court orally overruled both evidentiary objections at the hearing on the Motion.[8]

When attempting to establish the absence or existence of a dispute of material fact, parties must cite to specific materials in the record or show that the materials cited do not establish the absence or existence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. Barnes v. Indep. Auto. Dealers Ass'n Health & Benefit Plan, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). Only evidence admissible at trial may be considered in ruling on a motion for summary judgment. Orr, 285 F.3d at 773. In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment. Id.; see also Fed. R. Civ. P. 56(c)(2). Civil Rule 56(c)(2) permits a party to object to material offered in support of a motion for summary judgment if the material cannot otherwise be presented in a form that

_____

[8] As noted earlier, the bankruptcy court issued a tentative ruling, which is not included in the record on appeal. It is unclear whether the tentative ruling addressed the evidentiary objections.

-25-

would be admissible in evidence.

### 1. The first objection

McAllister's first evidentiary objection takes issue with the first declaration from Joe Vance and with Krengel's statement of uncontroverted facts and conclusions of law. A statement of uncontroverted facts is not evidence, but a pleading which states the facts that the filer believes to be undisputed. Civil Rule 56 does not contemplate the lodging of evidentiary objections against such pleadings. In this respect, McAllister's objection is improper and should be disregarded.

Turning to the first declaration of Joe Vance, McAllister enumerates twelve factual assertions which she finds objectionable. For each factual assertion, McAllister raises one or more grounds for objection, specifically: lack of foundation (enumerated assertions 1-12), relevance (enumerated assertions 2-4, 8-10, and 12), best evidence (enumerated assertion 5), and hearsay (enumerated assertions 11 and 12).

#### a. Relevance

The fact that a statement may be irrelevant has no bearing upon a motion for summary judgment. A bankruptcy court can award summary judgment only when there exists no genuine dispute of material fact. It cannot rely on irrelevant facts; thus, relevance objections are redundant. Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). If a decision on summary judgment relies on certain statements, they are by definition relevant. Instead of objecting, parties should simply argue that the statements in question are not material. Therefore, the bankruptcy court correctly overruled McAllister's

-26-

relevance objections.

### b. Lack of foundation

Assertions 1 through 7 involve facts that could be within the personal knowledge of the declarant. To be admissible, however, the declarant must state facts sufficient to establish the basis for his or her personal knowledge. Based upon the contents of the declaration, it was not an abuse of discretion for the bankruptcy court to overrule this objection. It is also difficult to see how McAllister was prejudiced by the admission of the declaration, as much of its contents had already been admitted by McAllister in her answer, or could have been introduced in other ways, such as via the Rule 2004 examination transcript (for example, all statements relating to the underlying state court action).

### c. Best evidence/hearsay

The bankruptcy court also did not abuse its discretion with respect to the remaining assertions. Again, the challenged statements relate to facts that McAllister had already admitted, can be derived from other parts of the record, or are legal conclusions mixed with facts.[9] To the extent the statements contain factual allegations, it was not an abuse of discretion for the bankruptcy court to consider them. And while a supporting affidavit is not the proper place to include legal argument, it was not "manifestly improper" for the bankruptcy

[9] For example, McAllister objects to assertion 11, which states "I am informed and believe Debtor's amended Schedule B indicates she owns a 2001 Mercedes Benz automobile; at the 2004 Examination, Debtor indicated her parents-in-law purchased just such a vehicle for her for $10,000 in 2011."

-27-

court to choose not to exclude these statements.

**2. The second objection**

McAllister's second evidentiary objection focuses on the second declaration of Joe Vance and the Deposition Transcript attached thereto. McAllister raises two arguments. First, she asserts that it is inappropriate for Krengel to offer evidence in its reply brief that it could have offered as part of the Motion. Second, she asserts that the Deposition Transcript should have been excluded because it was not properly authenticated.

**a. Consideration of evidence or argument presented in a reply**

In support of her first argument, McAllister cites Civil Rule 6(c)(2), which states in relevant part: "[a]ny affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). McAllister also cites several out of circuit cases.

Burns v. Gadsden State Community College, 908 F.2d 1512, 1519 (11th Cir. 1990), addresses the interplay between Civil Rule 6 and Civil Rule 56(c). Burns, however, addresses a trial court's exclusion of late filed affidavits by a nonmovant; it does not involve evidence included in a reply brief that could have been included in an original motion. While the case is not directly on point, it does support the assertion that Civil Rule 56(c), in combination with Civil Rule 6, are designed to provide the nonmoving party a meaningful opportunity to respond to the factual assertions and legal arguments contained within a motion for summary judgment.

Reid v. Lockheed Martin Aero. Co., 205 F.R.D. 655 (N.D. Ga.

2001) involves a motion for class certification. Plaintiffs bore the burden of establishing adequacy of representation. The court held that Plaintiffs failed to cite a single piece of evidence in support of their assertion that the requirement had been satisfied. In a footnote, the court acknowledged that Plaintiffs had filed an affidavit in support of their contentions with their reply brief and stated, without citation or analysis, that "[a]s a general rule, a party may not submit evidence with a reply that was available but not included with the original motion." Reid, 205 F.R.D. at 678 n.30.

Finally, in Tetra Techs, Inc. v. Harter, 823 F. Supp. 1116 (S.D.N.Y. 1993), the parties moving for summary judgment saved several legal and factual arguments for their reply brief. The court noted that this was for the "obvious purpose of sandbagging their adversary" and was foreign to the spirit of the Federal Rules of Civil Procedure. Harter, 823 F. Supp. at 1120. While the court discussed the reply brief with disdain, it is unclear from the opinion whether the brief was disregarded.

It does not appear that the Ninth Circuit takes such a strict approach to new information contained within a reply. Most cases addressing the issue conclude that consideration of new arguments or evidence in a reply falls within the discretion of the trial court. See, e.g., Zamani v. Carnes, 491 F.3d 990, 996 (9th Cir. 2007)("The district court need not consider arguments raised for the first time in a reply brief"); Glenn K. Jackson, Inc. v. Roe, 273 F.3d 1192, 1201-02 (9th Cir. 2001)(A district court has discretion to consider an issue on summary judgment even if first raised in the reply brief.). Other

-29-

circuits have acknowledged that the consideration of new evidence or argument at the reply stage can be permissible in certain circumstances. See, e.g., Green v. New Mexico, 420 F.3d 1189, 1196 (10th Cir. 2005)(If a reply contains new information (defined as either new evidence or new legal arguments), the Court needs to give the nonmoving party an opportunity to respond only if the Court will rely on that new material. It is not an abuse of discretion to ignore the new material and preclude a surreply).

In this case, the bankruptcy court could have, in its discretion, considered the new information provided by Krengel with its reply. The declaration served little purpose other than to introduce the Deposition Transcript. While permitting the moving party to introduce new information on summary judgment without giving the nonmoving party an opportunity to respond can be prejudicial to the nonmoving party, the bankruptcy court's overruling of McAllister's objection was not "manifestly erroneous" under these circumstances, specifically given the fact that McAllister had prior knowledge of the contents of the Deposition Transcript and of her own testimony under oath. Accordingly, the bankruptcy court did not abuse its discretion in overruling the second evidentiary objection.

### b. Failure to properly authenticate

McAllister's second objection also asserts that the Deposition Transcript was inadmissable because Joe Vance did not lay a proper foundation. The Deposition Transcript purportedly sets forth McAllister's testimony in connection with the State Court Action.

-30-

As noted above, it is the contents of the evidence, and not its form, which dictates its admissibility for purposes of summary judgment. Fraser, 342 F.3d at 1036-37. While the Deposition Transcript itself might not be admissible at trial without appropriate authentication, McAllister's statements therein can be considered in the summary judgment context. Id. at 1037 (notwithstanding a hearsay objection, in the context of a motion for summary judgment the contents of a diary were "mere recitations of events within the [plaintiff/appellant's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways.").

Further, the bankruptcy court's consideration of the unauthenticated Deposition Transcript would only constitute harmless error given that the document could have easily been authenticated at trial. See Hal Roach Studios, Inc. v. Feiner & Co., 896 F.2d 1542 (9th Cir. 1990)(Trial court's consideration of unauthenticated registration statement was harmless where failure could have been easily remedied by a statement from a competent witness, or substitution of certified copy). McAllister does not argue that the deposition never took place or that the Deposition Transcript was somehow inaccurate. She simply contends that Mr. Vance is not competent to authenticate that document. A competent witness, namely McAllister, could easily cure this alleged defect. Alternatively, the bankruptcy court could have permitted Krengel to obtain a certified copy of the Deposition Transcript. For these reasons, the bankruptcy court did not abuse its discretion by overruling McAllister's objection and considering this evidence.

**B.** **The Bankruptcy Court erred by weighing evidence to determine that McAllister had the requisite intent to hinder, delay, or defraud Krengel under section 727(a)(2)(A)**

A bankruptcy court must deny a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition. . . ." 11 U.S.C. § 727(a)(2)(A). The burden of proof is on the creditor to show that: (1) the debtor transferred or concealed property; (2) the property belonged to the debtor; (3) the transfer occurred within one year of the bankruptcy filing; and (4) the debtor executed the transfer with the intent to hinder, delay or defraud a creditor. In re Aubrey, 111 B.R. 268, 273 (9th Cir. BAP 1990).

Section 727(a)(2) states its intent requirement in the disjunctive. Thus, a movant need only demonstrate one of the three alternatives, either intent to hinder or to delay or to defraud creditors. Beauchamp v. Hoose (In re Beauchamp), 236 B.R. 727, 731-32 (9th Cir. BAP 1999), aff'd 5 Fed. Appx. 743 (9th Cir. 2001) (adopting the Panel's opinion). A court must liberally construe a claim for denial of a discharge in favor of the discharge and strictly against the party arguing for its denial. First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986).

Constructive fraudulent intent cannot be the basis for denial of discharge. Id. at 1343. However, fraudulent intent sufficient to justify denial of discharge may be established by circumstantial evidence or by inferences drawn from a course of

-32-

conduct. Id. (citing In re Devers, 759 F.2d at 753-754 (noting that a debtor is unlikely to testify directly that his intent was fraudulent)). In examining the relevant circumstances or conduct, a court may focus on "badges of fraud," including: (1) a close relationship between the transferor and the transferee; (2) the transfer was in anticipation of a pending suit; (3) the transferor debtor was insolvent or in poor financial condition at the time of the transfer; (4) all or substantially all of the debtor's property was transferred; (5) the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) the debtor received inadequate consideration for the transfer. Roberts v. Erhard (In re Roberts), 331 B.R. 876, 885 (9th Cir. BAP 2005). These factors need not all be present in order to find that a debtor acted with the requisite intent. Id.

Krengel's argument for denial of discharge pursuant to section 727(a)(2) consists of two sentences: "Defendant has misrepresented the value and description of her assets, including her jewelry, KFM and two automobiles. This omission warrants denial of discharge under § 727(a)(2)." Motion p. 8. In Krengel's argument for denial of discharge pursuant to section 727(a)(4), Krengel asserts, "[i]n light of a pattern of behavior abusing the bankruptcy process, these acts when weighed altogether evidence cause to deny Debtor's discharge per § 727(a)(4)." Motion p. 10. Finally, Krengel asserts in its argument for denial of discharge pursuant to section 727(a)(5), "[t]hat a 2004 Examination was needed just to flesh out some of

-33-

the discrepancies in her schedules is evidence of possible wrongful intent." Motion p. 11. Taken together, the Panel can infer from these statements that Krengel believes the misrepresentations and omissions in McAllister's bankruptcy documents are evidence of her intent to hinder, delay, or defraud creditors.

McAllister does not dispute that she amended her schedules to increase the reported value of her jewelry and KFM, or that she described the two automobiles as Krengel complains. McAllister flatly disagrees with Krengel's assertion that the misstatements in her schedules and SOFA — to the extent that they were misstatements — warrant a denial of her discharge. McAllister asserts that the misstatements were benign, did not affect the administration of the estate, and were not made with any intent to hinder, delay or defraud creditors.

The bankruptcy court erred in granting summary judgment pursuant to section 727(a)(2) for two reasons. First, Krengel did not meet its burden of establishing an intent to hinder, delay, or defraud creditors. Krengel did not even address the element of intent in its argument. And in fact, Krengel's response to McAllister's objection to the proposed order acknowledges the existence of a factual dispute regarding intent, and that the bankruptcy court weighed the evidence in finding McAllister's explanations lacking credibility. Response to Opposition to Proposed Order p. 2.

Second, even if the Panel could infer intent from McAllister's multiple misstatements, McAllister has proffered evidence sufficient to create a genuine dispute of material fact.

-34-

Her declaration, as well as the statements she made under oath at the Rule 2004 examination, explain each of the issues raised by Krengel. Appropriately considered in a light most favorable to McAllister, a trier of fact could find that the misstatements did not evidence a pattern of misconduct, but were simply unintended errors or benign mistakes. Assessment of a witness' credibility is appropriate for trial, not in considering a motion for summary judgment. Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990) ("When judging the evidence at the summary judgment stage, the district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party.").

**C. The Bankruptcy Court erred by finding that Krengel met its burden as to McAllister's failure to keep or preserve recorded information under section 727(a)(3)**

Section 727(a)(3) provides that a court shall grant a debtor a discharge unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).

The initial burden of proof under section 727(a)(3) is on the plaintiff. Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1296 (9th Cir. 1994)(Cox II). In order to establish a prima facie case, the plaintiff must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure

makes it impossible to ascertain the debtor's financial condition and material business transactions. Id.

What constitutes adequate records must be decided case by case, based on debtor's business operations and sophistication. AVCO Fin. Servs. of Billings v. Sullivan (In re Sullivan), 111 B.R. 317, 321 (Bankr. D. Mt. 1990)(citing In re Horton, 621 F.2d 968 (9th Cir. 1980)(construing 11 U.S.C. § 32(c)(2) of the Bankruptcy Act)). The debtor must maintain "sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." Cox v. Lansdowne (In re Cox), 904 F.2d 1399, 1402 (9th Cir. 1990)(Cox I)(quoting In re Horton, 621 at 971). "Keep" means to maintain a record, as in "to keep a diary." Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999). "This language places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." Id.

Once the objecting party shows that the debtor's records are absent or inadequate, the burden of proof shifts to the debtor to justify the inadequacy or nonexistence of records. Cox II, 41 F.3d at 1296. The debtor must show, by a preponderance of the evidence, that failure to keep adequate business records was justified under all of the circumstances in the case. Id. at 1297.

Krengel's Motion argues that denial of discharge was justified under section 727(a)(3) because McAllister: (1) failed to adequately explain certain expense items on her schedules during her deposition; (2) failed to disclose the loan

-36-

forgiveness by her mother, the loans from her family members, the transfer of the diamond necklace, and payments made on her behalf by KFM; (3) incorrectly listed her debt to Krengel as "disputed" in her schedules; and (4) failed to keep adequate records for KFM. After making these allegations in its Motion, Krengel states the conclusion that "Defendant has undeniably failed to keep and maintain adequate records, including financial documentation." Motion p. 9.

The first three allegations are not material to a determination that McAllister (1) failed to maintain records, and (2) that said failure made it impossible to ascertain the debtor's financial condition. Section 727(a)(3) is concerned with a debtor's record keeping, not the adequacy of her disclosures (which is relevant under sections 727(a)(2) and (a)(4)). The Motion makes no attempt to relate the adequacy of McAllister's disclosure with her failure to maintain records. In its appellate brief, Krengel goes a bit further, alleging that McAllister was "unable to produce records to explain (1) the commingling of income and expenses on Debtor's schedules, but [sic] (2) the failure to disclose the executory contracts/clients of the wholly-owned business entity, or (3) the payment of Debtor's legal expenses in the State Court Action made by KFM (not a party to the State Court Action)." Appellee's Brief p. 30. Even if this assertion had been raised before the bankruptcy court (which it was not), Krengel does not cite to, and we have not been able to find, any material in the record to support the assertion that McAllister did not maintain or turn over information related to these business records.

Unlike the first three allegations in the Motion, Krengel's fourth allegation could satisfy the first prong of section 727(a)(3). However, Krengel again fails to cite in its Motion or in its reply to any material in the record to support this allegation. While a movant should cite to particular parts of the record to support its position on summary judgment, a court may consider uncited materials in the record. Fed. R. Civ. P. 56(c)(3). We are unable to find any evidence, apart from Krengel's bare assertion, that McAllister failed to keep and maintain adequate records for KFM. The 2004 examination transcript is full of instances where Krengel asks McAllister if she possessed or could produce documents, to which she repeatedly replied that she (1) had already provided such documentation, (2) could provide it, or (3) had an accountant who maintained such information. McAllister also testified that she maintained books for KFM. Krengel does not allege, and the record does not reflect, that McAllister did not keep records of her transactions with KFM. The record simply does not support the result reached by the bankruptcy court.

As for McAllister's transactions with her mother and brother, looking beyond the unsupported facts and arguments contained in Krengel's Motion and reply, we have been able to find just two specific instances of McAllister not keeping or maintaining records that are specifically mentioned in the record on appeal. First, McAllister did not keep a written record of the loan from her brother; second, KFM did not have written

-38-

contracts with its clients.[10]

If the absence of written records was sufficient by itself to justify denial of discharge under section 727(a)(3), summary judgment might have been appropriate. However, the movant must also establish that these failures resulted in an inability to assess the debtor's financial condition. Here again, there appears to be no evidence in the record to support such a conclusion. For these reasons, the bankruptcy court should have denied summary judgment on Krengel's claim under section 727(a)(3).

### VI. CONCLUSION

For the reasons stated above, the bankruptcy court should not have granted summary judgment in favor of Krengel under sections 727(a)(2) or (a)(3). We therefore REVERSE and REMAND for further proceedings.

---

[10] In its brief, Krengel asserts that, in addition to failing to keep records of the loan from her brother, McAllister failed to keep a record of the loan from her mother. The declarations, 2004 exam transcript, and Deposition Transcript make no reference as to whether the loan with her mother was reduced to writing or evidenced in some other way.

-39-